OPINION *Page 2 
{¶ 1} Defendant-Appellant, Richard Thompson, Jr., appeals the judgment of the Allen County Court of Common Pleas convicting him of two counts of trafficking in cocaine and sentencing him to a six-year prison term. On appeal, Thompson argues that his convictions were not supported by sufficient evidence; that his convictions were against the manifest weight of the evidence; and, that his due process rights were violated because the trial court imposed non-minimum, consecutive sentences. Based upon the following, we affirm the judgment of the trial court.
 {¶ 2} In January 2006, the Allen County Grand Jury indicted Thompson for one count of trafficking in cocaine in violation of R.C.2925.03(A),(C)(4)(d), a felony of the third degree, and one count of trafficking in cocaine in violation of R.C. 2925.03(A),(C)(4)(e), a felony of the second degree.
 {¶ 3} In March 2006, Thompson entered a plea of not guilty to both counts in the indictment.
 {¶ 4} In November 2006, the case proceeded to jury trial, during which the following testimony was heard regarding the third degree felony of trafficking in cocaine.
 {¶ 5} Investigator Matt Treglia of the West Central Ohio Crime Task Force testified that, during January and February 2006, he participated in a controlled drug transaction in Allen County; that a confidential informant (hereinafter referred to as "C.I.") contacted him and "advised that he could purchase larger quantities of cocaine *Page 3 
from Mr. Thompson" (trial tr., v. I, p. 156); that he had used C.I. on previous occasions and had "found him to be very reliable and very credible" (trial tr., v. I, p. 196); that, on January 31, 2006, he gave C.I. $1,000 of police money to use in the transaction; that he followed C.I. to 2090 Brookhaven Court; that C.I. was wearing a surveillance wire; that C.I. went into the residence and then came out of the residence with Thompson; that C.I. and Thompson drove to the Hollywood Video parking lot; that a red Blazer driven by Christopher Martello entered the parking lot; that Thompson exited CI.'s vehicle and entered Martello's vehicle; that, a short time later, Thompson exited Martello's vehicle and re-entered CI.'s vehicle; that C.I. and Thompson returned to 2090 Brookhaven Court and went inside the residence; and, that C.I. returned to a pre-determined location where he turned over twenty-eight grams of cocaine to Investigator Treglia.
 {¶ 6} Investigator Andrew Johnson of the West Central Ohio Crime Task Force testified that he participated in a controlled drug buy on January 31, 2006; that he was assigned to survey the Brookhaven Court residence and watch for persons or vehicles involved; that he observed C.I. pull into the driveway of the residence and an individual, later identified as Thompson, come out of the residence and enter CI.'s vehicle; that the vehicle traveled to the Hollywood Video parking lot; that a red Blazer pulled into the parking lot at Hollywood Video right next to CI.'s vehicle; that Thompson exited CI.'s vehicle, entered the Blazer, and then exited the Blazer and re-entered CI.'s vehicle. *Page 4 
 {¶ 7} C.I. then testified that, in January 2006, he advised the West Central Ohio Crime Task Force that he could buy cocaine from Thompson; that he "asked [Thompson] if he could get any large amounts of cocaine — an ounce. He said he would get back with [C.I.] because he had to make some phone calls. Very shortly he got back with [C.I.] and said that whenever [he] wanted to go and do it, well, it's good to go" (trial tr., v. II, p. 241); that, at this time, Thompson was living at 2090 Brookhaven Court; that the red Blazer belonged to "the fellow who [Thompson] purchased the cocaine from" (trial tr., v. II, p. 243); that, on January 31, 2006, he called Thompson and asked Thompson to get him some cocaine; that he agreed to purchase one ounce of cocaine for $1,000; that "[Thompson] called [him] and said it was a go. [He] picked [Thompson] up at 2090 Brookhaven. [They] drove to Hollywood Video. [He] gave [Thompson] the thousand dollars. [Thompson] exited [C.I.'s] truck and went into the red Blazer. [Thompson] was in there approximately twenty to thirty seconds in the Blazer. [Thompson] got back in the passenger seat of [C.I.'s] truck. [Thompson] had the cocaine" (trial tr., v. II, p. 244); that "[Thompson] didn't want money. He just wanted some coke for getting the deal. So, he broke off a piece and gave [C.I.] the rest of the cocaine and it was a done deal" (trial tr., v. II, p. 244); that Thompson broke off the piece of cocaine himself, in the presence of C.I., and then handed the rest of the cocaine to C.I.; and, that the piece of cocaine was Thompson's payment for arranging the transaction. *Page 5 
 {¶ 8} Martello testified that, on January 31, 2006, Thompson informed him that he "* * * wanted to party with a friend and he wanted to get the set amount that he was supposed to get, the ounce" (trial tr., v. II, p. 284); that his role was that "[he] was just supposed to get [the cocaine for Thompson] and bring it back to him" (trial tr., v. II, p. 286); that he drove a red Blazer to Hollywood Video where he had arranged to meet with Thompson; that Thompson was in the passenger seat of a brown vehicle and he did not recognize its driver; that Thompson got out of the brown vehicle and got into Martello's red Blazer where Thompson gave him the money and Martello gave him the cocaine; and, that Thompson exited Martello's vehicle and got back into the brown vehicle and departed.
 {¶ 9} Investigator Thomas McNamara of the West Central Ohio Crime Task Force testified that he hand-delivered an envelope containing a white powder substance that was evidence of the drug transaction conducted by Investigator Treglia on January 31, 2006, to the Bureau of Criminal Identification and Investigation (hereinafter referred to as "B.C.I.I.") in Bowling Green, Ohio, and that the B.C.I.I. reported that the envelope contained a "[w]hite substance, twenty-eight point nineteen grams, found to contain cocaine." (Trial Tr., v. II, p. 340).
 {¶ 10} Thereafter, Thompson testified that he had a "severe" cocaine addiction during the three years preceding the events in issue; that he has known C.I. for four or five years; that he had snorted cocaine with C.I. approximately twenty times; that, on *Page 6 
January 31, 2006, C.I. called him and asked him to accompany him to Wal-Mart; that C.I. picked him up but they did not go to Wal-Mart because C.I. told him he had to talk to Martello at Hollywood Video; that "he figured [C.I.] was picking up drugs when he said he was going to meet [Martello] * * * [b]ecause [Martello] had sold [Thompson] drugs many times" (trial tr., v. II, p. 358); that he did not arrange or know anything about the meeting between C.I. and Martello prior to its occurrence; that C.I. got out of the car and talked to Martello, but that Thompson stayed in CI.'s car and did not talk to Martello or enter his Blazer; and, that he did not ask for or receive any drugs from C.I. on that occasion.
 {¶ 11} The following testimony was heard regarding the second degree felony count of trafficking in cocaine.
 {¶ 12} Investigator Treglia testified that, on February 3, 2006, C.I. called him and informed him that Thompson had contacted him and "stated that he could get an eighth of a ki of cocaine[1], which is a hundred and twenty-four grams of cocaine" (trial tr., v. I, p. 164); that he issued $3,500 of police money to C.I. to purchase the cocaine; that he arranged for an officer to observe 2090 Brookhaven Court; that, through the surveillance wire, he heard C.I., Martello, and Cameron Quatman "start talking and conversing amongst themselves in there about dope, about weights, and then they talk[ed] about *Page 7 
setting up further deals down the road" (trial tr., v. I, p. 165); and, that C.I. returned to a pre-determined location where he turned over the narcotics to Investigator Treglia.
 {¶ 13} Investigator Johnson testified that he participated in a controlled drug transaction on February 3, 2006; that he set up surveillance of the Brookhaven Court residence; that he saw the red Blazer pull into the driveway and watched its occupants, Martello and Quatman, as they exited the Blazer, knocked on the door, waited on the porch for a few minutes, and then departed in the Blazer; that C.I. arrived at the Brookhaven Court residence and went inside; that the red Blazer then returned and Martello and Quatman went into the residence; that, during this time, a white vehicle was parked in the driveway that was registered to Thompson; and, that he did not see Thompson during this particular transaction.
 {¶ 14} C.I. testified that he participated in a controlled drug transaction on February 3, 2006, at 2090 Brookhaven; that he "called [Thompson] to make another buy. This time it was for a larger quantity. If was four and a half ounces. The same thing — [Thompson] made some phone calls and * * * called [C.I.] back and said it was a go and as soon as [C.I.] got the money to meet [Thompson] there and it was a done deal" (trial tr., v. II, p. 249); that Thompson told him that the cost would be $3,500; that Thompson told him to meet him at the 2090 Brookhaven residence; that "[he and Thompson] were sitting at the kitchen table waiting for the cocaine to arrive. [The two other men] knocked on the door. They came in. They put the cocaine out. They counted the money. *Page 8 
That was it" (trial tr., v. II, p. 251); that he gave the money to Thompson who gave it to the two men; that the two men gave him the cocaine after counting the money; that "after [the two men] got their money they split. [C.I.] * * * notched [Thompson] off some cocaine. He said, `Is that all I get?' [C.I.] said, `Do you want more?' [Thompson] said, `Yea.' So, [C.I.] broke him off another piece" (trial tr., v. II, p. 252); that he gave Thompson the three or four gram piece of cocaine he cut off for arranging the deal, which Thompson began snorting immediately; and, that "[Thompson] didn't want money. He just wanted the cocaine for his part of the deal." (Trial Tr., v. II, p. 253).
 {¶ 15} Martello further testified that he was involved in a drug transaction on February 3, 2006; that Thompson "stated to [him and Quatman] that he had wanted four and a half ounces * * *" (trial tr., v. II, p. 292); that Thompson agreed to pay them $3,500 for the cocaine; that the transaction took place at the Brookhaven residence; and, that when they arrived, "[t]here was already some money sitting on the table, in-between [Thompson] and [C.I.]. * * * [Martello and Quatman] walked in and [they] sat down. [Quatman] pulled [the cocaine] out. It was in a Crown Royal bag. He took the Crown Royal Bag out of his pocket. We passed the drugs across the table to [C.I.]. He had a scale there and he weighed the drugs. After that basically everyone kind of counted the money. Pretty much everyone participated in that. Then after that was over [C.I.] opened the bag and pulled out * * * just a piece of [the cocaine] and put it on the table where it was proceeded to be broken up with a card and put out into a line. Then *Page 9 
[Thompson] rolled up a dollar bill and snorted it, like you would do cocaine." (Trial Tr., v. II, p. 295).
 {¶ 16} Quatman, Martello's friend, testified that he was involved in a drug transaction on February 3, 2006; that Martello accompanied him to pick up the cocaine and the pair traveled to the Brookhaven Court residence; that he, Martello, Thompson, and C.I. were all present at the residence; that they sat down at "* * * a circular table with four seats" (trial tr., v. II, p. 319); that he carried the drugs into the house and set them on the table; that he did not remember if he counted the money; and, that he and Martello received a $500 profit from the transaction.
 {¶ 17} Investigator McNamara testified that he hand-delivered an envelope containing a white powder substance that was evidence of the drug transaction conducted by Investigator Treglia on February 3, 2006, to the B.C.I.I. and that the B.C.I.I. reported that the envelope contained a "[w]hite substance, one hundred and seventeen point sixty-eight grams, found to be cocaine." (Trial Tr., v. II, p. 343).
 {¶ 18} Finally, Thompson testified that he was present during a drug transaction at 2090 Brookhaven on February 3, 2006; that C.I. came to the residence without giving him notice and had never informed him that he wanted to buy a large amount of drugs; that Quatman and Martello arrived and Quatman took some drugs out of a bag and gave it to C.I.; that C.I. gave Martello the money; that he did not handle the money; that the cocaine went directly from Quatman's hands to CI.'s hands and Thompson did not touch *Page 10 
it; that C.I. often shared drugs with him and gave him a "line" on this particular occasion; and, that he did not arrange any drug transactions between C.I. and Martello or Quatman or receive any drugs or payment for arranging a transaction.
 {¶ 19} Subsequently, the jury convicted Thompson of both counts of trafficking in cocaine.
 {¶ 20} In January 2007, the trial court sentenced Thompson to a two-year prison term on the third degree felony conviction of trafficking in cocaine and to a four-year prison term on the second degree felony conviction of trafficking in cocaine, to be served consecutively. Further, the trial court ordered Thompson to pay a $5,000 fine and $1,100 in restitution for the third degree felony and a $7,500 fine and $3,700 in restitution for the second degree felony.
 {¶ 21} It is from this judgment that Thompson appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I THE VERDICT FOR COUNT I WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE THAT MR. THOMPSON AIDED OR ABETTED THE DRUG TRAFFICKERS, AS THE ONLY EVIDENCE WAS THAT HE AIDED OR ABETTED THE DRUG PURCHASER.
 Assignment of Error No. II THE VERDICT FOR COUNT I WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AS THE EVIDENCE ONLY SUPPORTED A CONCLUSION THAT MR. THOMPSON AIDED *Page 11 OR ABETTED THE DRUG PURCHASER AND NOT THE DRUG TRAFFICKERS.
 Assignment of Error No. III THE VERDICT FOR COUNT II WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE THAT MR. THOMPSON AIDED OR ABETTED THE DRUG TRAFFICKERS, AS THE ONLY EVIDENCE WAS THAT HE AIDED OR ABETTED THE DRUG PURCHASER.
 Assignment of Error No. IV THE VERDICT FOR COUNT II WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AS THE EVIDENCE ONLY SUPPORTED A CONCLUSION THAT MR. THOMPSON AIDED OR ABETTED THE DRUG PURCHASER AND NOT THE DRUG TRAFFICKERS. THE TRIAL COURT IMPROPERLY DENIED CREDIT TO RICK THOMPSON FOR TIME SERVED PENDING RESOLUTION OF THIS MATTER.[2]
 Assignment of Error No. V TRIAL COURT IMPOSED NON-MINIMUM, CONSECUTIVE SENTENCES PURSUANT TO AN EX POST FACTO JUDICIALLY-CREATED SENTENCING LAW, IN VIOLATION OF HIS RIGHT TO FREEDOM FROM SUCH ENACTMENTS AND IN VIOLATION OF DUE PROCESS.
 {¶ 22} Due to the nature of Thompson's assignments of error, we elect to address his first, second, third, and fourth assignments of error together.
 Assignments of Error Nos. I, II, III, IV *Page 12 {¶ 23} In his first, second, third, and fourth assignments of error, Thompson argues that both jury verdicts were not supported by sufficient evidence to prove beyond a reasonable doubt that he was guilty of trafficking in cocaine and were against the manifest weight of the evidence. Specifically, Thompson argues that the evidence demonstrates that he merely aided or abetted the drug purchaser, not the drug traffickers, and asserts that aiding or abetting the drug purchaser is not trafficking under R.C. 2925.03. We disagree.
 {¶ 24} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Monroe (2005), 105 Ohio St.3d 384, 392, citing State v.Jenks (1981), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 1997-Ohio-355. Sufficiency is a test of adequacy, State v. Thompkins (1997), 78 Ohio St.3d 380, 386,1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. State v. Robinson (1955),162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in Smith, supra.
 {¶ 25} Additionally, when an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine *Page 13 
whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins,78 Ohio St.3d at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. Thus, only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.
 {¶ 26} R.C. 2925.03 governs trafficking offenses stating, in pertinent part:
 (A) No person shall knowingly do any of the following: (1) Sell or offer to sell a controlled substance;
 * * *
 (C)(4)(d) * * * if the amount of the drug involved equals or exceeds ten grams but is less than one hundred grams of cocaine that is not crack * * *, trafficking in cocaine is a felony of the third degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the third degree.
 * * *
 (C)(4)(e) * * * if the amount of the drug involved equals or exceeds one hundred grams but is less than five hundred grams of cocaine that is not crack * * *, trafficking in cocaine is a felony of the second degree, and the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree.
 {¶ 27} Additionally, "[f]or purposes of R.C. 2925.03(A)(1), `sale' means: deliver, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, agent, servant, or employee." State v. Bridge, 3d Dist. No. 1-06-30, 2007-Ohio-1764, at ¶ 26, citing R.C. 3719.01(AA); State v.Siferd, *Page 14 151 Ohio App.3d 103, 2002-Ohio-6801, at ¶ 44. R.C. 2923.03, governing complicity, provides that:
 (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 (1) Solicit or procure another to commit the offense;
 (2) Aid or abet another in committing the offense;
 * * *
 (B) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender.
 {¶ 28} "Solicit" is defined as "to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear." "Procure" is defined as "to get, obtain, induce, bring about, motivate." "Aided or abetted" is defined as "supported, assisted, encouraged, cooperated with, advised, or incited." 4 OJI 523.03.
 {¶ 29} Courts have upheld trafficking convictions where an undercover agent twice asked a defendant where he could obtain marijuana and the defendant introduced the agent to two individuals who proceeded to sell marijuana to the agent, State v. Dillon (1994), 12th Dist. No. CA93-07-022, 1994 WL 142501 (stating that "[a]ppellant, on two separate occasions, procured for an undercover agent persons, otherwise unknown to the agent, who sold the agent marijuana and enabled marijuana trafficking"); where undercover agents asked a defendant if he had any crack on three separate occasions, and, on all three occasions, the defendant replied that he did not have any crack but directed the agents to other individuals who sold crack to the agents, State v. Moore
(1992), 10th Dist. No. 91AP-1129, 1992 WL 131844 (stating that "defendant brought about or *Page 15 
motivated the commission of the crime in taking defendant to a place where he knew a sale could occur, in directing [the agent's] attention to the appropriate individuals, and in assisting the commission of the crime by bringing together a purchaser and seller"); where a defendant signaled to and approached an undercover agent's car, the agent asked the defendant for cocaine, the defendant directed a third party to the agent's car, the third party sold the agent cocaine, and the defendant asked the agent for some of the cocaine for his efforts, State v.Williams (1996), 1st Dist. No. C-950571, 1996 WL 348192; and, where an undercover agent asked a defendant if she could purchase cocaine, the defendant responded that he would "check with his boys," got into his car with a third party, and then told the agent to come outside where the third party sold her cocaine, Bridge, supra.
 {¶ 30} Here, regarding the January 2006 transaction, the record indicates that testimony existed that C.I. asked Thompson to get him an ounce of cocaine on January 31, 2006; that Thompson arranged the deal with Martello; that Thompson drove with C.I. to the location of the deal; that Thompson gave Martello C.I.'s money in exchange for cocaine; and, that Thompson broke off a piece of the cocaine for himself as his payment for arranging the deal and gave the remaining twenty-eight grams of cocaine to C.I.
 {¶ 31} Regarding the February 2006 transaction, the record indicates that testimony existed that C.I. asked Thompson to get him four and one-half ounces of cocaine; that Thompson arranged the deal with Martello and Quatman to take place at his 2090 *Page 16 
Brookhaven residence; that C.I. gave the money to Thompson, who handed it to Martello and Quatman; that everyone counted the money; that Martello and Quatman gave the cocaine to C.I.; that C.I. gave Thompson two pieces of cocaine for his involvement in the deal; and, that C.I. turned over one hundred seventeen grams of cocaine to investigators.
 {¶ 32} Thompson urges us to distinguish between aiding and abetting in the sale of the cocaine and aiding and abetting in the purchase of the cocaine. In support of his argument, Thompson cites State v. Dyson
(1982), 12th Dist. No. 81-CA-10, 1982 WL 3124. In Dyson, the defendant argued that her only contact with the drug transaction was to arrange a ride and she had no contact with the drug sellers, and, therefore, she could not be "a complicitor as an aider and abettor to trafficking in marijuana." The court denied her argument, finding that she was a complictor in the transaction because she understood that she "furthered a common scheme." In dicta, the court stated that "[t]he evidence presented at trial indicated that appellant knew that her acts were in furtherance of a sale and not merely of a buy." Thompson claims that this phrase shows a distinction between aiding and abetting in a sale and aiding in abetting in a purchase. However, Thompson's argument relies entirely on this phrase and ignores the finding of Dyson that the defendant acted in complicity to trafficking for merely arranging a ride and having no contact with drug sellers. Likewise, as in Dillon, Moore,Williams, and Bridge, we decline to distinguish Thompson's actions from trafficking. *Page 17 
 {¶ 33} After viewing the evidence presented in a light most favorable to the prosecution, we conclude that the evidence is sufficient to support Thompson's conviction for trafficking cocaine. This is because the evidence, if believed, could convince a rational trier of fact of Thompson's guilt beyond a reasonable doubt.
 {¶ 34} Additionally, although Thompson's testimony contradicted the State's testimony, the jury was free to believe all, part, or none of any witness' testimony. State v. Antill (1964), 176 Ohio St. 61. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its judgment for that of the trier of fact." State v. Awan (1986),22 Ohio St.3d 120, 123. Thus, because the weight to be given the evidence and credibility of witnesses rests with the trier of fact, we find that Thompson's convictions for trafficking in cocaine were not against the manifest weight of the evidence.
 {¶ 35} Accordingly, we overrule Thompson's first, second, third, and fourth assignments of error.
 Assignment of Error No. V {¶ 36} In his fifth assignment of error, Thompson argues that the trial court violated his due process rights by imposing non-minimum, consecutive sentences pursuant to an ex post facto, judicially created sentencing law. Specifically, Thompson argues that the Supreme Court of Ohio's decision in State v. Foster, 109 Ohio St.3d 1, *Page 18 2006-Ohio-856, severing portions of Ohio's felony sentencing statute, constitutes an ex post facto law when applied retroactively to him.
 {¶ 37} In Foster, the Supreme Court of Ohio held that portions of the felony sentencing statutes requiring judicial factfinding before imposition of the maximum, more than the minimum, or consecutive sentences were unconstitutional and severed those portions.Foster, 2006-Ohio-856, at ¶ 100. Consequently, Foster held that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus.Foster further explained that "[o]ur remedy does not rewrite the statutes, but leaves courts with full discretion to impose prison terms within the basic ranges of R.C. 2929.14(A) based upon a jury verdict or admission of the defendant without the mandated judicial findings [of fact.] * * *" Id. at ¶ 102.
 {¶ 38} In State v. McGhee, 3d Dist. No. 17-06-05, 2006-Ohio-5162, this Court found that Foster did not violate the due process clause. For the reasons set forth in McGhee, we find that Thompson's argument lacks merit. Thompson committed the crimes in issue after the United States Supreme Court decided Apprendi v. New Jersey (2000), 530 U.S. 466, 490,120 S.Ct. 2348, which indicated that a major change in criminal sentencing law was probable. Furthermore, the sentencing range for *Page 19 
Thompson's offenses, of which he had notice prior to the commission of the crimes, has remained unchanged. See McGhee at ¶¶ 16, 20; R.C.2925.03(A), (C)(4)(d), (C)(4)(e).
 {¶ 39} Accordingly, we overrule Thompson's fifth assignment of error.
 {¶ 40} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 SHAW and WILLAMOWSKI, JJ., concur. r
[1] Investigator Treglia later clarified on cross-examination that an "eighth of a ki" means one eighth of a kilogram of cocaine.
[2] We note that in the "Statement of the Assignments of Error" in Thompson's brief, the fourth assignment of error contains a second sentence reading, "THE TRIAL COURT IMPROPERLY DENIED CREDIT TO RICK THOMPSON FOR TIME SERVED PENDING RESOLUTION OF THIS MATTER." However, this portion of the assignment of error was not argued in the body of Thompson's brief or addressed at oral argument. Accordingly, we disregard this portion of the assignment of error under App.R. 12(A)(2) and, instead, decide only the first sentence of the assignment of error that is briefed and argued in Thompson's brief. *Page 1